# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT


## 05-1272


## STATE OF LOUISIANA IN THE INTEREST
## OF C.F. & M.F.


**********


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC-2003-1004 B
HONORABLE HERMAN CLAUSE, DISTRICT JUDGE


**********


## SYLVIA R. COOKS
## JUDGE


**********


Court composed of Sylvia R. Cooks, Billy H. Ezell, and James T. Genovese, Judges.

## JUDGMENT OF TRIAL COURT REVERSED AND SET ASIDE.

Michael Harson
District Attorney, 15th Judicial District
Michelle Breaux
P.O. Box 3306
Lafayette, LA   70502
(337) 232-5170
COUNSEL FOR APPELLEE:
       State of Louisiana

Dan K. Kennison
405 West Main Street, Suite 300
Lafayette, LA  70501
(337) 291-9832
COUNSEL FOR APPELLANT:
       Barbee Falcouner Laine

**Allyson Edwards**
**115 West Main Street, Suite 19**
**P.O. Box 3862**
**Lafayette, LA  70502**
**(337) 264-8027**
**COUNSEL FOR:**
        **C.F. and M.F.**

**Vivian Neumann**
**730 Jefferson Street**
**P.O. Box 2220**
**Lafayette, LA  70502**
**(337) 237-1113**
**COUNSEL FOR DEFENDANT:**
        **Jerome Latiolais**

**William Vidrine**
**Vidrine & Vidrine, L.L.C.**
**711 W. Pinhook Road**
**Lafayette, LA  70503**
**(337) 233-5195**
**COUNSEL FOR APPELLANT:**
        **Barbee Falcouner Laine**

**Sarah Comeaux**
**CASA of Acadiana Advocate Coordinator**
**1319 W. Pinhook Road, Suite 330**
**Lafayette, LA  70503**
**(337) 593-2272**
**COUNSEL FOR:**
        **Karen Kulberth, CASA Volunteer**

**Schewanna Simmons**
**825 Kaliste Saloom**
**Lafayette, LA  70508**
**(337) 262-5901**
**COUNSEL FOR:**
        **Department of Social Services**

**COOKS, Judge.**

In this child custody dispute, the mother appeals the trial court's judgment granting custody of her minor son, M.F., to the State of Louisiana, Office of Child Services (OCS).

## FACTS AND PROCEDURAL HISTORY

On December 28, 2003, John Burke found C.F., a nine-year-old boy (born May 26, 1994), alone without adult supervision. Burke, who was acquainted with C.F.'s mother, noted C.F. had a black eye and scratches around his neck. Burke called the police, who were told by C.F. that he had been alone for 8 to 10 hours. He also told police he had the black eye because he had been punched in the face by his mother. The police arrested the mother, who was charged with child desertion and second degree battery. She was convicted and placed on probation.

On December 29, 2003, C.F. and his brother M.F. (born July 3, 1997), were adjudicated Children in Need of Care and were placed in the custody of OCS. C.F. and M.F. have different biological fathers, and M.F. resided with his biological father when the incident on December 28, 2003 occurred.

On January 5, 2004, the court issued an Order of Continuing Custody with OCS. It found that C.F. and M.F. were Children in Need of Care. It further found OCS had made reasonable efforts to prevent the children's removal from the home but could not, "due to the nature of the situation and the mother's inability to provide a safe and adequate environment for the minor children and due to her chronic and longstanding substance abuse history and incarceration preventative efforts could not be made at this time." OCS developed a case plan for the mother with an eventual goal of reunification. OCS assumed legal custody of M.F., who was placed into the physical custody of his biological father, with visitation set for every two weeks with

the mother. C.F. was placed in the custody of his biological father and stepmother, who resided in Oklahoma.

Following a review hearing held on June 21, 2004, the court ordered that the children remain in the custody of the State for six more months noting "inadequate progress has been made toward alleviating or mitigating the causes necessitating the children's continued placement in foster care and the reunification is not possible at this time." Subsequently, M.F.'s father voluntarily relinquished physical custody, and M.F. was placed in foster care. At that time, C.F. remained in Oklahoma with his father and stepmother.

On November 30, 2004, the mother filed a Motion and Order for Return of Child to the Biological Mother seeking custody of M.F. and termination of OCS's involvement. A hearing on the motion was set for December 22, 2004. At the conclusion of the hearing, the parties stipulated M.F. would remain in the custody of the State for three additional months, at which time another review hearing would be held. The parties also stipulated that during this period both parents would be allowed to visit with M.F. C.F. remained with his father and stepmother in Oklahoma.

On January 18, 2005, a hearing was held to address certain concerns involving M.F., stemming from an "incident" that occurred with the mother. There is nothing in the record stating what this "incident" involved. By agreement of the parties, the trial court conducted a permanent placement hearing on that date. Legal and physical custody of M.F. was returned to his biological father with reasonable visitation rights in favor of the mother. The trial court made the following comments at the hearing:

> And let me just add one thing. And I know [the mother] was trying to get custody. And I read in detail the progress that she did, and it was excellent. I read all the progress notes, everything in there. And, of course, all she has – she had custody and now she has – an incident

happened and now she'll have visitation. I'll ask that she not allow the loss of custody to deter her from continuing the work she's done because it may be in the future that she'll need to be called upon as a resource possibly for custody. Because these – this child is not an easy child to work with, and it may be in the future that we'll have to change custody again. I don't know. But keep your act together so that you can remain a possible resource for the child.

Judgment was signed on January 28, 2005. Within days after the January 18 hearing, the father again decided he did not want to have legal and physical custody of M.F. and informed the mother of this change of heart. In response, the mother filed a petition before a different trial judge in Family Court seeking custody of M.F., noting the father's desire to return custody to her. A joint stipulation was signed by the mother and father stating the best interest of M.F. would be served by the mother assuming legal and physical custody. Judgment was signed in Family Court by Judge Keaty on January 21, 2005, granting custody to the mother with reasonable visitation to the father. When OCS received information about the change in custody, it sent a letter to the trial court on February 11, 2005, noting the change in custody and stating "it appears this matter was handled without a hearing and there is no indication that the juvenile hearing held on January 18, 2005 was referenced."

On March 22, 2005, the parties returned for a court hearing initiated by "some strange" turn of events involving M.F.'s custody. Summarizing the events involved after custody of M.F. was granted to the father on January 18, 2005, the court stated:

> The Court gave custody of [M.F.] to [the father]. And then [the father] and [the mother], who had been – whose custody had been removed, a couple of days after we granted custody, decided – three (3) days after, decided to go to Judge Keaty and get Judge Keaty to sign an order, without informing Judge Keaty of the fact that there had been the Child in Need of Care proceedings, extensive Child in Need of Care proceedings. She signed an order giving custody back to the person that custody was removed from in the first place. And we set this to get this straight.

The trial court was undoubtedly upset by what it perceived to be a "back-door"

attempt by the mother and/or her attorney to gain custody of M.F. The trial court initially stated he was rescinding both its order granting custody to the father and Judge Keaty's order granting custody to the mother, and ordering the State to take custody of M.F. At that point, OCS's representative requested that the judge "court-order family supervision and leave custody with [the mother] . . . because I think there was some indication that -- she was making some good choices for the child." The trial court then noted because the mother had not appeared at this hearing it was issuing an order for the mother's arrest. The mother's attorney explained that the mother was not present because she was at a hearing being held in juvenile court in Oklahoma pertaining to C.F. The mother's attorney explained his understanding of the confusion that led to the mother's non-appearance at the hearing:

> Your Honor, I'd just like to posit for the Court that what it appears happened is on December 22nd [2004] she was – she was served for a hearing, obviously, for today. And then what it appeared to everybody, including me at the time, was that the next hearing in January concluded all matters with child protection. And so at that point, we didn't feel that there were any more – that there were any more court dates set.

The mother's attorney stated that he did not find out about the March 22, 2005 hearing until the day before it was scheduled to convene. He immediately called the Clerk of Court to find out if the matter was still set on the docket. Once the Clerk confirmed that the matter was scheduled, the attorney stated he called the mother immediately to advise her of the fixing. However, the mother was already in Oklahoma to attend a hearing involving C.F. A contentious exchange then occurred between the trial court and the mother's attorney:

> THE COURT: Because I think the openness and honesty coming from you and your client has not happened in this court.
>
> MR. KENNISON: Well, I'm sorry the Court feels that way.
>
> THE COURT: Even though I had a very favorable impression of the work she had done. I read the reports. In fact, I complimented her when

I made the ruling. I wasn't ready to give her custody, but I guess [the father] was. And there was some deception in going to Judge Keaty for this order without informing Judge Keaty of all of the circumstances surrounding that.

MR. KENNISON: Your honor, I'm not going to make a response to that at this time.

THE COURT: I don't think you should.

MR. KENNISON: I'd just ask the Court not to put her in jail, but simply to ask her to – to order her to come in and report why she was someplace else, so that the Court could have the facts before – I think it would just traumatize the child, Your Honor. That's what I would put before the court. It would traumatize the child to be put back in custody even for a day or two. I think it – I think what ended up – what ended up happening has not been damaging to the child, but to do –

THE COURT: I don't know that. I don't know that.

MR. KENNISON: Well, maybe if the Court would just –

THE COURT: Wait. If I'd have thought that's where this child needed to be, I'd have given her custody.

MR. KENNISON: I understand.

THE COURT: Judge Keaty didn't know anything about this case. But, yet, y'all chose to go to Judge Keaty and get an order giving her custody, without informing her that this is a person that custody had been removed from and that three (3) days before I had chosen not to give her custody. You know, that was a lie. I mean, we expect more than that. I expect more than that from anybody, especially an attorney who appear before this Court. I mean, I expect you to tell me the things that you don't want me to hear, if it's the truth. And to intentionally withhold the truth from a judge, I think is absolutely reprehensible. And I think that occurred. And now when we try to have a – to get this thing straightened out, she decides it's more important to go to Oklahoma.

MR. KENNISON: And that's the point, Your Honor. She did not decide. She was already in Oklahoma.

THE COURT: She went. She went to Oklahoma when she had an order to be here.

MR. KENNISON: I'd just posit that it's understandable confusion and –

THE COURT: It seems like all that happens in this case is confusion, doesn't it?

-5-

MR. KENNISON:    But I understand the Court is angry with me, but I would prefer that the Court would be angry with me –

THE COURT:    Not just you.

MR. KENNISON:    – than hurt the client or the child.

MS. NEUMANN:    And, Judge, for the record, I had represented the father, and I had absolutely no idea if this was a plan because I was never told anything to that effect.

THE COURT:    Uh-huh.

MR. KENNISON:    And there was no plan.  I mean, he took action three (3) days afterwards, and she asked me to draw up papers to take care of it.  And it's my understanding, and my recollection, that in the courtroom on the record, this judge said that if we were not happy with the visitation or the arrangements made, that we would have to go to a different court.  We were going to be in another court at that time.  And I did not intentionally conceal anything from you, Judge.

THE COURT:    I read the transcript.  Okay?

MR. KENNISON:    I have not, and I would like to ask for it.

THE COURT:    I have.

MR. KENNISON:    Can I have it?  I'm asking for it on the record.

THE COURT:    Uh-huh.  If you pay for it.

MR. KENNISON:    I've offered to pay for it before.

OCS REPRESENTATIVE:    I think when your secretary contacted us, you wanted all the parties to be a part of this.  And I think a big part of this is [the father] is not here.  I understand from CASA that they had some involvement after the last hearing where he was quite inappropriate, he didn't want to help set up the visitation.  And, you know, they did call the school and confirm that [the mother] was choosing to stay here with the child to keep him in school so that he wouldn't have to change schools, even though she really wanted to be in Houston to get out of the area.  So it did seem. In some way, an inkling of, like, trying to put her child's needs before her own.  So I was impressed with that.

THE COURT:    Well, I was impressed – Let me tell you what, I was impressed with the work she had done.  And I said that.  But I'm totally unimpressed with what has happened since I gave custody to [the father].

-6-

DEPUTY CLERK:    Judge, he was also served to be here today.

THE COURT:    What?

DEPUTY CLERK:    He was also served to be here today.

THE COURT:    *I want arrest warrants issued for [the father] and [the mother]. That's it. I'm not going to remove custody. But when she gets arrested, then we may have to. But she brought this on herself.*

DEPUTY CLERK:    *You're still rescinding custody on both parties, rescinding the order?*

THE COURT:    *No. But we may have to eventually.*

(Emphasis added).

Despite the fact that the attorney for the mother gingerly tried to remind the court of the January 18, 2005 hearing and the procedural facts which caused confusion for all the parties regarding the continued fixing of the March 22, 2005 hearing, and OCS recommendation that M.F. remain with the mother, the trial judge issued arrest warrants for the mother and father.[1]

On April 26, 2005, another hearing involving M.F. was held. Again, there was significant confusion among the parties as to what this hearing concerned. OCS's representative was not aware of the purpose of the hearing. The assistant district attorney stated it was her "understanding that this is basically somewhat of a review hearing . . . to determine the status and - - of the placement of [M.F.]" The court replied that it was "somewhat of a review." At that point, the mother's attorney stated

---

[1] We find the trial court's anger over the mother's failure to appear at the March 22, 2005 hearing was not a reasonable response under the circumstances. Our review of the record indicates there was great confusion surrounding this hearing. The assistant district attorney stated she was "not quite certain why we're hear on it." The OCS representative stated she "didn't realize it was going to be a hearing." The mother's attorney stated he was unaware of the hearing until the day before, and when he attempted to contact the mother she was already in Oklahoma for a hearing involving C.F. The trial court maintained the mother's attendance was mandated based on personal service to her on December 22, 2004. As the mother's attorney opined, it appeared that all matters concerning M.F. were resolved on January 18, 2005, when a permanent placement of M.F. was made to the father. We agree. As will be explained in detail later in this opinion, the Child in Need of Care proceedings involving M.F. were terminated on that date, and the trial court was divested of jurisdiction. Therefore, the hearing held on March 22, 2005, was not proper and the mother cannot be held at fault for failing to attend it.

-7-

he was under the belief they were scheduled that day for a contempt hearing, and he was not prepared for a review hearing. The trial court then ordered OCS to assume custody of M.F. The relevant portion of the hearing went as follows:

> MR. KENNISON: I'd like to discuss it with you instead. And besides that, Your Honor, I'd also like to urge that, as to the - - as to the notices for having a contempt hearing today, I did receive that timely for preparation. As to any notice mailed or otherwise delivered by the Sheriff, of the hearing today on any kind of review, that was not received by this office, it was not served by the Sheriff, and, thus, we don't have any notice of it adequate in time to prepare, which is what I wanted to explain to the Court. We don't have - - we don't have time to prepare for a review hearing. We were preparing for a contempt hearing and we are ready to go forward with the contempt hearing.

> THE COURT: Okay. Well, you understand that the order by Judge Keaty granting [the mother] custody is hereby revoked.

> MR. KENNISON: Well, I haven't seen that it is, but I - -

> THE COURT: I'm telling you it is, - -

> MR. KENNISON: - - heard.

> THE COURT: - - okay?

> MR. KENNISON: Then, I mean, we're not - - we're not worried if the Court is then going to place the child back with [the father].

> THE COURT: The child should be placed, at this time, back in the custody of the State.

> MR. KENNISON: In the State?

> THE COURT: Yes.

> MR. KENNISON: Your Honor, at that point - - at that point, what we're urging is that if you're taking action in this case, that you don't have jurisdiction at this point.

> THE COURT: Judge Keaty does.

> MR. KENNISON: Well, I guess then we'd have to have a hearing with Judge Keaty and due process notice to have a hearing.

> THE COURT: No. Where's the child?

> MR. KENNISON: I don't know.

THE MOTHER:     He's in New - -

THE COURT:     The child is not in the State of Louisiana?

THE MOTHER:     Yes.  He's in New Iberia.

THE COURT:     I'll order OCS to take custody of the child.

MR. KENNISON:     Can we discuss what grounds is that on?  Is there a new allegation.

THE COURT:     I'm not going to enter into a discussion with you.

MR. KENNISON:     Okay.  So without a hearing - - just to clarify, without a hearing, without any notice of a hearing, that you're having OCS take custody because Judge Keaty has allegedly rescinded her order.

THE COURT:     Uh-huh.

The trial court then stated Judge Keaty's order granting the mother custody "is hereby revoked." The court also ordered M.F. placed into the custody of OCS without taking any evidence and over the objection of the mother.  A Judgment Modifying Disposition was signed by the trial court on June 8, 2005 reflecting the ruling in open court on April 26, 2005, ordering the transfer of custody to OCS.  The judgment also stated that "[t]he Court further learned that Judge Keaty recalled and/or reversed said judgment, upon learning of the prior proceedings in this Court."  There is no copy of any revocation issued by Judge Keaty in the record.  One week later, on June 15, 2005, the trial court signed a judgment stating its "[j]urisdiction over all custody matters involving the child [M.F.], remains in effect and is ongoing; and that the Judgment rendered in this Court on January 18th, 2005 in open Court and signed January 28, 2005 . . . has no effect on that Jurisdiction."  This appeal followed.  The mother asserts the trial court erred in granting custody of M.F. to OCS.

**ANALYSIS**

A trial court's determination regarding child custody is to be afforded

great deference and should not be disturbed absent a clear abuse of discretion. *Hawthorne v. Hawthorne*, 96-89 (La.App. 3 Cir. 5/22/96), 676 So.2d 619, *writ denied*, 96-1650 (La. 10/25/96), 681 So.2d 365. Louisiana Civil Code Article 131 states that "the court shall award custody of a child in accordance with the best interest of the child." Comment (a) to that article suggests this guideline is the "overriding test to be applied in all child custody determinations."

The mother argues the trial court erred in not finding the best interest of M.F. mandated that she be awarded custody. The mother also argues she was denied due process at the hearing on April 26, 2005, following which the custody of M.F. was modified without the taking of any testimony or evidence. We pretermit ruling on the merits of the mother's "best interest" argument because the hearings held on March 22, 2005 and April 26, 2005 were improper and the judgments flowing from them must be set aside. Title VI, Chapter 16 of the Louisiana Children's Code governs cases where a child has been removed from a parent's custody following an adjudication as a child in need of care. Of particular importance in the present case are the following articles:

Louisiana Children's Code Article 701:

If at any point in child in need of care proceedings, the child is removed from his parents' care and control and placed in the custody of the department, *the provisions of this Chapter shall govern the subsequent review process until such time as the child achieves a permanent placement as defined in Article 603(15).*

Louisiana Children's Code Article 603(15):

"Permanent placement" means:

(a) *Return of the legal custody of a child to his parent(s).*

(b) Placement of the child with adoptive parents pursuant to a final decree of adoption.

(c) Placement of the child with a legal guardian.

(Emphasis added.)

At the January 18, 2005 hearing the trial court terminated OCS's involvement with M.F. and returned custody to the biological father with reasonable visitation rights in favor of the mother. Judgment was signed on January 28, 2005, decreeing "custody of the minor child is granted to his father . . ." The judgment further stated "this Disposition is the least restrictive disposition and *permanent plan . . .*" The judgment was a permanent placement as defined in Article 603(15). Accordingly, the Child in Need of Care proceedings were concluded when M.F. was permanently placed with his father. Therefore, the trial court was divested of jurisdiction in this matter after the permanent placement of M.F.

A review of the record indicates the trial court was aware of the question of jurisdiction at the April 26, 2005 hearing. When questioned by the mother's attorney as to whether it had jurisdiction, the trial court replied "Judge Keaty does." Undoubtedly in response to the mother's attorney's concerns over jurisdiction, the trial court signed a judgment on June 15, 2005, stating its earlier judgment rendered on January 28, 2005 had no effect on its jurisdiction. The trial court did not possess the power to re-vest jurisdiction it clearly recognized it was divested of by the January 28, 2005 judgment. Further, we find nothing in the statutes or jurisprudence which allowed Judge Clause to rescind Judge Keaty's civil custody order; and, therefore, to usurp her jurisdiction to continue a Child in Need of Care proceeding in which a permanent placement had been made and a final judgment had been rendered. Likewise, any revocation of Judge Keaty's order granting custody to the mother in this Child in Need of Care proceeding was improper. Only Judge Keaty possessed the requisite jurisdiction to revoke her order in the separate civil proceeding within the delays provided by law. Although the trial judge states Judge Keaty did so at his

-11-

request, there is no such order filed in the record before us.

We note there is a letter in the record from OCS, dated February 11, 2005, alerting the trial court of the proceedings before Judge Keaty. There is nothing in the letter asserting that M.F.'s immediate removal from the mother was necessary for his protection from further abuse or neglect as required by TitleVI of the Louisiana Children's Code, arts. 601, et seq., to reopen a Child in Need of Care proceeding and to vest new jurisdiction in the trial court to entertain the State's application for protective orders. After reviewing the procedural facts presented, we are convinced the trial court did not have jurisdiction to adjudicate M.F.'s custody on April 26, 2005.

**DECREE**

For the foregoing reasons, the judgments of the trial court on June 8, 2005 and June 15, 2005 are reversed and set aside. It is ordered, adjudged, and decreed that the State of Louisiana, Office of Child Services is given ten days from receipt of this opinion to initiate Child in Need of Care proceedings anew if it deems such is warranted. If OCS chooses not to initiate Child in Need of Care proceedings within the time allowed, legal and physical custody shall be returned to the mother in accordance with this court's judgment.

**JUDGMENT OF TRIAL COURT REVERSED AND SET ASIDE.**